RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0074p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

─────────────────

SCOTT B. PEATROSS, Administrator ad Litem for the
Estate of Anjustine A. Hunter Vanterpool,
*Plaintiff-Appellee*,

*v.*

No. 15-5288

CITY OF MEMPHIS, et al.,
*Defendants*,

TONEY ARMSTRONG, in his individual capacity,
*Defendant-Appellant*.

─────────────────

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:14-cv-02343—Sheri H. Lipman, District Judge.

Argued: October 9, 2015

Decided and Filed: March 29, 2016

Before: KEITH, CLAY, and WHITE, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** Elijah Noel, Jr, HARRIS SHELTON HANOVER WALSH, PLLC, Memphis, Tennessee, for Appellant. Andrew C. Clarke, LAW OFFICES OF ANDREW C. CLARKE, Memphis, Tennessee, for Appellee. **ON BRIEF:** Elijah Noel, Jr, HARRIS SHELTON HANOVER WALSH, PLLC, Memphis, Tennessee, for Appellant. Andrew C. Clarke, LAW OFFICES OF ANDREW C. CLARKE, Memphis, Tennessee, Danese K. Banks, THE COCHRAN FIRM, Memphis, Tennessee, for Appellee.

_____

**OPINION**

_____

DAMON J. KEITH, Circuit Judge.  This civil rights action arose from the shooting death of Anjustine A. Hunter Vanterpool ("Vanterpool").  Vanterpool was killed after Officers Joel Dunaway ("Officer Dunaway") and Steve McMillen ("Officer McMillen") of the Memphis Police Department ("MPD" or "Department") fired seven shots into the front and rear windows of the vehicle Vanterpool was operating.  Alleging various constitutional violations, Vanterpool's estate ("Estate" or "Plaintiff") sued, among others, Toney Armstrong ("Armstrong"), Director of the MPD, pursuant to 42 U.S.C. § 1983.  Asserting the defense of qualified immunity, Armstrong moved to dismiss the claim against him in his individual capacity.  The district court denied the motion, concluding that Armstrong was not entitled to qualified immunity.  Armstrong timely appealed.  For the following reasons, we AFFIRM.

**I.  BACKGROUND**

**Facts Alleged in the Complaint**

The Estate alleges the following relevant facts in its Complaint.  On April 23, 2013, Officers Dunaway and McMillen were on duty working for the MPD.  At 6:36 p.m., the Officers were at the Northside Market and Grocery store ("Northside Market").  Vanterpool, a black male, pulled up to the gas pumps at this location, driving a purple 1993 Chevrolet Caprice.  Officer McMillen was then contacted by Officer Sir Crease Brooks ("Officer Brooks").  Officer Brooks advised Officer McMillen that a purple Chevrolet was pulling up and that he wanted Officer Dunaway to call him.

Vanterpool entered the Northside Market to purchase gas and other items and returned to his vehicle at approximately 6:38 p.m.  He attempted to pump gas into his vehicle, but the gas pump was not turned on.  He went to the back door of the Northside Market at approximately 6:39 p.m. and informed the store clerk that the pump was not turned on.  He returned to his vehicle and began pumping gas.

Officer Dunaway exited the Northside Market at approximately 6:40 p.m. and made a call on his cellular phone looking towards the gas pumps. Officer Dunaway was allegedly on the telephone with Officer Brooks. Officer Brooks advised him that the purple Chevrolet that was at the gas pumps was the same vehicle he had seen the day before with expired tags. Officer Brooks further stated that when he ran the tag number through dispatch, it was noted that the tags were not registered to that vehicle. Officer Brooks also said that the man driving the vehicle was the same man he had seen driving it the day before.[1] Officer Brooks had followed the man to a store under the guise that he was going to the restroom, but instead he waited to talk to him about the vehicle. Officer Brooks, however, had lost sight of the man and the vehicle sometime thereafter.

Officer McMillen exited the Northside Market at approximately 6:40 p.m. He stood near Officer Dunaway as Officer Dunaway was on the phone with Officer Brooks. At approximately 6:41 p.m., Vanterpool finished pumping his gas. Seconds later, Officer Dunaway, while still talking on his cellular phone, walked towards Vanterpool's vehicle. Officer McMillen followed.

Vanterpool walked around the vehicle to get back in the vehicle a few seconds later. Immediately thereafter, Officer Dunaway, while still on his cellular phone, approached Vanterpool's vehicle. Officer McMillen did the same. Vanterpool began to drive away. However, Officer McMillen positioned himself in front of Vanterpool's vehicle with his gun drawn and pointed it at Vanterpool in an effort to seize him. Thereafter, Officer McMillen "either lunged or jumped towards or on the hood of" Vanterpool's vehicle with his gun drawn. At the time, neither Officer McMillen nor Officer Dunaway had observed Vanterpool commit any felony or misdemeanor.

Officers Dunaway and McMillen then fired into the driver's side front and back windows of Vanterpool's vehicle. Vanterpool's vehicle traveled a short distance and came to a stop across the street from the Northside Market. By the time the vehicle stopped, a total of seven (7) shots had been fired into Vanterpool's vehicle. Officers Dunaway and McMillen then holstered their

---

[1]It is unclear from the face of the Complaint precisely where Officer Brooks was located while he was on the telephone with Officer Dunaway.

guns, and Officer Dunaway began talking on his shoulder radio. The Officers then crossed the street toward the area where the vehicle had come to rest.

Officer Dunaway approached the passenger side of Vanterpool's vehicle and attempted to open the door. Officer McMillen stood towards the back of the vehicle on the driver's side. Vanterpool died as a result of the shooting. His estate filed a lawsuit pursuant to 42 U.S.C. § 1983 against Officers McMillen, Dunaway, and various other members of the MPD—including the director of the MPD, Defendant Armstrong. The Estate alleges that Officers Dunaway and McMillen violated Vanterpool's right to be free from unreasonable seizure pursuant to the Fourth Amendment of the United States Constitution.

The Estate alleges that Armstrong personally condoned, encouraged, approved, or at least implicitly authorized the conduct of Officers Dunaway and McMillen; personally failed to properly hire, train, supervise, monitor, and discipline officers of the MPD, including Officers Dunaway and McMillen; showed deliberate indifference to Vanterpool's rights; and consciously disregarded the known and foreseeable consequences of failing to correct deficiencies in the Department.

The Estate further alleges that there is a direct causal link between the deficient policies and customs of the Department and the violation of Vanterpool's constitutional rights. As a direct result of Armstrong's policy, practice, or customs, Vanterpool's constitutional rights were allegedly violated, and he was killed.

According to the Complaint, from 2009 to 2013, there had been fifty-four (54) officer shootings. From April 2012 to April 23, 2013—the day Vanterpool was killed—eighteen (18) people had been shot and/or killed at the hands of the MPD. In 2012, Director Armstrong "acknowledged a dire need to review and improve the police department's operations." Armstrong "noted that the MPD needed to improve its disciplinary process as well as the policies and procedures in line with the best law enforcement practices[;]" however, no improvements were made. In September 2012, "Mayor A.C. Wharton publicly admonished Director Armstrong and described the MPD as 'unacceptable' and in need of outside scrutiny to analyze its shortcomings in recruitment, accountability, and training in ethical standards."

The Estate further alleges that Armstrong "created a custom and pattern of [sic] practice of exonerating [] officers who use excessive force[.]" In so doing, Armstrong "allowed Memphis police officers to believe that they may violate the civil rights of its citizens as long as they allege that they thought the victim had a weapon or could pose some theoretical danger at a later time."

The shooting death of Memphis Police Officer Martoiya Lang in December 2012 fostered a "heightened" sense of alert among officers in the Memphis area. However, no additional training was given to the officers, and soon thereafter, a number of police-related shootings occurred in Memphis. A "common theme" in each shooting situation included the officers alleging that the individual pointed a gun at them or had a deadly weapon. The MPD failed to investigate any of these claims thoroughly, and in most instances, accepted the word of the officers. Officers Dunaway and McMillen had been involved in two separate incidents involving the use of excessive force prior to the killing of Vanterpool.

The Estate alleges that Armstrong essentially allowed the officers to "do whatever they want, whenever they want, to whomever they want, irrespective of the United States Constitution." Armstrong was involved at least in part in creating and enforcing all department policies; he did not punish officer misconduct, including the use of excessive force; he failed to take action in the face of the growing use of excessive force by officers and admonishment from the Mayor on the issue; and he "rubber stamped" officer misconduct.

Armstrong filed a motion to dismiss the supervisory liability claim against him in his individual capacity, asserting qualified immunity. The district court denied the motion, concluding that the Complaint alleged facts supporting that Armstrong "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." The court also concluded that the Complaint adequately alleged facts supporting that Vanterpool's constitutional rights were violated and that the right was clearly established at the time. Armstrong timely filed this interlocutory appeal.

## II.  DISCUSSION

### A.  Appellate Jurisdiction

Ordinarily, 28 U.S.C. § 1291 bars our review of interlocutory appeals—appeals of orders short of final judgment.  *See* 28 U.S.C. § 1291.  However, under the collateral-order doctrine "a limited set of district-court orders are reviewable" even though they are "short of final judgment." *Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009).  "[A] district court's order rejecting qualified immunity at the motion-to-dismiss stage of the proceeding" is a final appealable decision for purposes of the collateral-order doctrine.  *Id.* at 672.  However, such an appeal must only raise issues of *law*, not factual disputes; in other words, the defendants "must be willing to concede to the facts as alleged by the plaintiff and discuss only the legal issues raised by the case."  *Shehee v. Luttrell*, 199 F.3d 295, 299 (6th Cir. 1999); *see also Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) ("A denial of a claim of qualified immunity is immediately appealable only if the appeal is premised not on a factual dispute, but rather on 'neat abstract issues of law.'" (citation omitted)).

Here, the district court denied Armstrong's motion to dismiss after rejecting his defense of qualified immunity.  Armstrong has conceded the well-pled factual allegations in the Complaint for the purposes of this appeal.  Accordingly, we have jurisdiction to consider the matter at this stage of the proceedings.  *See Shehee*, 199 F.3d at 299.  The issue of law we must decide is whether "based on the facts as alleged by [the Estate], [Armstrong] violated [Vanterpool's] clearly established constitutional rights."  *See Campbell v. City of Springboro*, 700 F.3d 779, 790 (6th Cir. 2012); *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011) ("When the qualified immunity defense is raised at the pleading stage, the court must determine only whether the complaint adequately alleges the commission of acts that violated clearly established law.") (internal quotation marks omitted).

### B.  Standard of Review

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to seek dismissal based on the plaintiff's "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "A claim is facially plausible when a plaintiff 'pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Coley v. Lucas Cty.*, 799 F.3d 530, 537 (6th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678). Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the defendant is entitled to a meritorious affirmative defense such as qualified immunity. *Cf. id.* at 536-37. We review the denial of a motion to dismiss on qualified immunity grounds de novo. *Id.* at 536.

## C. Analysis

### Qualified Immunity

Although violations of constitutional rights by government officials acting under color of state law are generally subject to redress under 42 U.S.C. § 1983, the doctrine of qualified immunity shields officials from liability "insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citation omitted). This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Accordingly, the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Id.* at 232 (internal quotation marks and citation omitted).

In determining whether government officials are entitled to qualified immunity, we conduct a two-step inquiry: first, viewing the facts in the light most favorable to the plaintiff, "do the facts alleged show that the officer's conduct violated a constitutional right?" *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). Second, was "the right clearly established" at the time of the violation? *See id.*; *see also Roane*, 534 F.3d at 538−39. Courts have discretion to decide which prong of the analysis to address first, *Pearson*, 555 U.S. at 236, and the plaintiff

"bear[s] the burden of showing that a clearly established right has been violated and that the official's conduct caused that violation," *Essex v. Cty. of Livingston*, 518 F. App'x 351, 357 (6th Cir. 2013). For the purposes of this appeal, we find it appropriate to first address whether Armstrong's conduct violated Vanterpool's constitutional rights.

## 1. Did Armstrong's Conduct Violate Vanterpool's Constitutional Rights?

### A. *Individual Capacity Claims versus Official Capacity Claims*

Although Officers Dunaway and McMillen shot Vanterpool, the Estate seeks to hold Armstrong liable in his individual capacity under a claim of supervisory liability. It is important to note at the outset that a § 1983 *individual*-capacity claim differs from a § 1983 *official*-capacity claim. *See Essex*, 518 F. App'x at 354. An official-capacity claim against a person is essentially a claim against the municipality. *Id.* On the other hand, an individual-capacity claim seeks to hold an official personally liable for the wrong alleged. *See id.* "On the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right[.]" *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989) (internal quotation marks omitted) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). However, "[m]ore is required in an official-capacity action. . . . [T]he entity's 'policy or custom' must have played a part in the violation of federal law." *Id.*

### B. *Supervisory Liability*

Supervisors are often one step or more removed from the actual conduct of their subordinates; therefore, the law requires more than an attenuated connection between the injury and the supervisor's alleged wrongful conduct.**[2]** *See Roane*, 534 F.3d at 544 ("While an individual supervisor may still be held liable in his or her individual capacity . . . the Estate must point to a specific action of each individual supervisor to defeat a qualified immunity claim.").

At the outset, there are clear situations in which supervisory liability does not attach. It is well-settled that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676. In other

---

**[2]**In this case, the district court concluded that the Complaint sufficiently alleged that Officers Dunaway and McMillen violated Vanterpool's constitutional rights. Armstrong does not challenge this conclusion on appeal.

words, a supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another. *See Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006). Consequently, a mere failure to act will not suffice to establish supervisory liability. *Id.*; *see also Essex*, 518 F. App'x at 355 ("There must be some conduct on the supervisor's part to which the plaintiff can point that is directly correlated with the plaintiff's injury.").**3** We have long held that supervisory liability requires some "active unconstitutional behavior" on the part of the supervisor. *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999); *see also Hays v. Jefferson Cty.*, 668 F.2d 869, 873-74 (6th Cir. 1982) (A "mere failure to act (even) in the face of a statistical pattern of incidents of misconduct" is not sufficient to confer liability) (internal quotation marks omitted).

However, "active" behavior does not mean "active" in the sense that the supervisor must have physically put his hands on the injured party or even physically been present at the time of the constitutional violation. *See, e.g.*, *Campbell*, 700 F.3d at 790 (holding that a police chief was not entitled to qualified immunity although he was not "actively involved in the incidents" at issue); *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) (explaining that "[p]ersonal involvement is not limited solely to situations where a defendant violates a plaintiff's rights by physically placing hands on him") (alteration in original) (internal quotation marks omitted); *cf. Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002) (noting that encouragement, authorization, approval, and knowing acquiescence are all sufficient to confer liability). *But see Combs v. Wilkinson*, 315 F.3d 548, 558 (6th Cir. 2002) ("Because plaintiffs fail to present any evidence that Wilkinson, who was not even present . . . on the evening of the disturbance, engaged in active unconstitutional behavior, we affirm the summary judgment in his favor.").

---

**3**In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court of the United States concluded that in § 1983 suits, "the term 'supervisory liability' is a misnomer." 556 U.S. at 677. The Court reasoned that "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* Since *Iqbal*, the circuits have grappled with the precise contours of § 1983 supervisory liability, and while the claim of supervisory liability has not been altogether eliminated, the requirements for sustaining such a claim vary by circuit. *Compare Elkins v. District of Columbia*, 690 F.3d 554, 566 (D.C. Cir. 2012) (noting that supervisory liability is "triggered only when a supervisor fails to provide more stringent training in the wake of a history of past transgressions . . . or provides training so clearly deficient that some deprivation of rights will *inevitably* result absent additional instruction") (internal quotation marks omitted), *with Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (noting that in order to succeed on a § 1983 claim of supervisory liability, the plaintiff must show, among other things, that the supervisor "had actual or constructive knowledge" that his or her subordinate "engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like plaintiff") (internal quotation marks omitted).

"[A] supervisory official's failure to supervise, control or train the offending individual is not actionable *unless* the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee*, 199 F.3d at 300 (emphasis added) (internal quotation marks omitted). We have interpreted this standard to mean that "at a minimum," the plaintiff must show that the defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *See id.*; s*ee also Roane*, 534 F.3d at 543.

As part of this inquiry, this court also considers whether there is a causal connection between the defendant's wrongful conduct and the violation alleged. *See, e.g.*, *City of Roseville*, 296 F.3d at 441. A close reading of § 1983 affirms this point. The statute states that every person acting under color of law who "subjects, or *causes* [a person] to be subjected" to deprivation of constitutional rights "shall be liable to the party injured[.]" 42 U.S.C. § 1983 (emphasis added). Accordingly, where an official's execution of his or her job function causes injury to the plaintiff, the official may be liable under the supervisory-liability theory. *See Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992); *accord* 42 U.S.C. § 1983.

In the instant case, the Complaint sufficiently alleges that Armstrong violated Vanterpool's constitutional rights because: (1) the facts plausibly allege that Armstrong knowingly acquiesced in the unconstitutional conduct of his subordinates through the execution of his job function; *see Coley*, 799 F.3d at 542, and (2) the facts plausibly allege that there is a causal connection between Armstrong's "acts and omissions" and Vanterpool's death, *see Campbell*, 700 F.3d at 790.

### (i)     *Armstrong knowingly acquiesced in the unconstitutional conduct of his subordinates through the execution of his job functions.*

The Complaint plausibly alleges that, at a minimum, Armstrong knowingly acquiesced in the unconstitutional conduct of his subordinates. Our case of *Coley v. Lucas Cty.*, 799 F.3d 530 (6th Cir. 2015), is instructive on this point. In *Coley*, the family of a deceased pretrial detainee brought suit against two law enforcement officers and their supervisor. *Id.* at 534. The family alleged that the decedent's constitutional rights were violated after he died in police custody. *Id.* at 534-35. A police officer had put the decedent in a chokehold that caused him to lose

consciousness indefinitely. *Id.* The death was later ruled a homicide. *Id.* at 535. The family sought to hold the sheriff, James Telb ("Telb"), personally liable under § 1983 for the conduct of his subordinates. *Id.* at 541. Telb moved to dismiss the claim, asserting qualified immunity. *Id.* at 521. The district court denied the motion, and we affirmed. *Id.* at 542. The family alleged that Telb had a duty to train and supervise the officers to avoid the use of excessive force. *Id.* It also alleged that Telb failed to train and supervise the officers properly; failed to investigate allegations of excessive force properly; and attempted to cover-up the homicide by making false statements to federal officials about the incident. *Id.* at 541-42. We concluded that these allegations were "sufficient to show" that Telb "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of" his subordinates. *Id.* at 542.

Like the plaintiff in *Coley*, Vanterpool's Estate alleges that Armstrong failed to train and supervise the officers to avoid the use of excessive force, failed to investigate the allegations of excessive force properly, and attempted to cover-up the unconstitutional conduct of his subordinates by exonerating the officers in an effort to escape liability. As previously indicated, the Complaint goes a step further by alleging that that from 2009 to 2013, there had been fifty-four (54) officer shootings. In one year's time, eighteen (18) people had been shot and/or killed at the hands of the MPD. In 2012, Director Armstrong "acknowledged a dire need to review and improve the police department's operations[,]" and "noted that the MPD needed to improve its disciplinary process." However, no improvements were made. Moreover, in September 2012, the mayor "publicly admonished Director Armstrong and described the MPD as 'unacceptable[.]'" At bottom, the Complaint alleges, Armstrong gave MPD officers the "green light" to violate the civil rights of citizens.

Taken as true, these facts and the inferences drawn therefrom[4] support the plausible inference that in the execution of his job functions, Armstrong at least knowingly acquiesced in the unconstitutional conduct of Officers Dunaway and McMillen. *See Coley*, 799 F.3d at 542; *see also Leach*, 891 F.2d at 1246 (observing that there was "at least some evidence" that the

---

[4]These statements are alleged facts and reasonable inferences that we accept as true rather than legal conclusions couched as factual allegations. *Cf. Roane*, 534 F.3d at 538 (noting that the issue of "whether the evidence adequately shows that each defendant knew of and consciously disregarded a serious medical condition" was a factual issue or an issue regarding a reasonable inference drawn from the facts).

sheriff "implicitly authorized, approved, or knowingly acquiesced," in the actions of his subordinates where he failed to punish their wrongful conduct after repeated violations of the same type).[5]   The facts of the Complaint plausibly allege that Armstrong "did more than play a passive role in the alleged violations or show mere tacit approval of the goings on." *See Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006).

For the foregoing reasons, the Complaint sufficiently alleges that Armstrong "at a minimum, knowingly acquiesced" in the unconstitutional conduct of his subordinates through the execution of his job functions. *See Coley*, 799 F.3d at 542.[6]

### (ii)    There is a causal connection between Armstrong's acts and omissions and Vanterpool's death.

The Complaint also sufficiently alleges a causal connection between Armstrong's conduct and Vanterpool's injury.   Our case of *Campbell v. City of Springboro*, 700 F.3d 779 (6th Cir. 2012), is instructive.   In that case, we held that even though a police chief had not been "actively involved" in the incidents directly causing the injury to the plaintiff, he was not entitled to qualified immunity because the record suggested "a causal connection between his acts and omissions and the alleged constitutional injuries."   700 F.3d at 790.   In that case, plaintiffs brought a § 1983 action against various city officials—including the chief of police—after plaintiffs were attacked and injured by a police dog.   *Id.* at 782.   In concluding that the police chief was not entitled to summary judgment on a claim of supervisory liability, we reasoned that the police chief allowed the dog into the field even after his training had lapsed; he "never required appropriate supervision of the canine unit and essentially allowed it to run itself[;]" he "failed to establish and publish an official K-9 unit policy[;] and he was seemingly oblivious to the increasing frequency of dog-bite incidents involving" the dog that ultimately injured the plaintiffs.   *Id.* at 790.   The police chief's "apparent indifference to maintaining a properly

---

[5]While in *Leach* we dealt with an official-capacity suit, rather than an individual-capacity suit, *see* 891 F.2d at 1245, this distinction is of no consequence to our analysis because in *Leach* we employed the same standard that we use for individual capacity claims.

[6]To be clear, we do not suggest that every time an MPD officer violates the constitutional rights of a citizen, Armstrong can be held liable for the conduct in his individual capacity.   Qualified immunity is a fact-intensive analysis and will, therefore, turn on the particular circumstances of each case.   Here, the Complaint sufficiently pleads that Armstrong *knowingly acquiesced* to the conduct that proximately caused the injury alleged, and we have long held that this behavior is enough.   *See Roane*, 534 F.3d at 543.

functioning K-9 unit could be reasonably expected to give rise to just the sort of injuries that occurred"—plaintiffs were attacked by the dog. *Id.* Accordingly, the chief of police was not entitled to qualified immunity. *See id.*

Similarly, the Complaint here alleges that Armstrong essentially allowed the officers to "do whatever they want, whenever they want, to whomever they want, irrespective of the United States Constitution." It alleges that Armstrong was involved at least in part in creating and enforcing all department policies; that he did not punish officer misconduct, including the use of excessive force; that he failed to take action in the face of the growing use of excessive force by officers and admonishment from the Mayor on the issue; and that he "rubber stamped" officer misconduct. And unlike the police Chief in *Campbell* who was "seemingly oblivious" to the increasing frequency of dog bites, the Complaint sufficiently alleges that Armstrong's state of mind was a step further—he had actual knowledge of the increasing frequency of shootings involving MPD officers. He even publicly acknowledged the need for change, but failed to follow through with any changes. Armstrong's alleged conduct of "rubber stamping" the behavior of officers who shot and killed individuals with increasing frequency "could be reasonably expected to give rise to just the sort of injuries that occurred"—Vanterpool's unfortunate death. *See Campbell*, 700 F.3d at 790. Accordingly, the Complaint sufficiently pled a causal connection between Armstrong's acts and omissions and Vanterpool's death.[7] *See id.*

---

[7]At oral argument, defense counsel relied on our unpublished opinion in *Essex*, 518 F. App'x 351, as the "best case" in support of the argument that the supervisory liability claim should be dismissed. *Essex* is distinguishable in part because here we consider a motion to dismiss, but there we considered whether a defendant was entitled to summary judgment. 518 F. App'x at 356. The standard for surviving a motion to dismiss is less stringent that the standard for surviving summary judgment. *Compare Whitfield v. Tennessee*, 639 F.3d 253, 258 (6th Cir. 2011) (noting that summary judgment is appropriate where, on the basis of undisputed facts, the moving party is entitled to judgment as a matter of law), *with Coley*, 799 F.3d at 537 (noting that to survive a motion to dismiss the plaintiff must plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged). Our decision regarding the instant motion to dismiss "should not be viewed as necessarily predictive of resolution of any future motion for summary judgment, should discovery produce evidence that would warrant such a motion." *See McConnell v. Butler Cty.*, No. 1:13-CV-210, 2013 WL 4482411, at *4 (S.D. Ohio Aug. 19, 2013) *report and recommendation adopted*, No. C-1-13-210, 2014 WL 4794401 (S.D. Ohio Sept. 25, 2014). Moreover, the facts of *Essex* distinguish it from the instant case. There, road patrol deputy Randy Boos had sexually assaulted a number of inmates while transporting them from the county jail to the courthouse, and the court held that allegations that Boos' supervisor "inadequately trained road patrol deputies and failed to supervise Boos despite knowing that sexual assaults on inmates were occurring in other jurisdictions," were insufficient to establish supervisory liability, noting that deliberate indifference alone could not support a claim against a supervisor in his individual capacity. 518 F. App'x at 352, 357. Here, in contrast, the Estate alleges that

## 2. Was the Constitutional Right Alleged Clearly Established?

We next examine whether the right alleged to have been violated was clearly established at the time of the violation. As an initial matter, Armstrong argues that the Estate failed to allege a clearly established right because the Estate seeks to hold Armstrong liable under a theory of supervisory liability, and Vanterpool did not have a constitutional right to additional police training. Armstrong's argument evinces a misunderstanding of this prong of the qualified immunity analysis. The Estate need not show that Vanterpool had a constitutional right to additional training or adequate supervision from Armstrong; it need only show that the right that Officers McMillen and Dunaway violated was clearly established at the time of the violation. *See, e.g.*, *Coley*, 799 F.3d at 539-41 (examining whether the right the *subordinate officers* violated was clearly established before concluding that the *sheriff* could be held liable for their actions under § 1983). Armstrong admits that Vanterpool's "Fourth Amendment rights are clearly established insofar as the alleged misconduct of Officer's Dunaway and McMillen are concerned." Appellant Reply Br. at 12. Based on Armstrong's concession, which is consistent with this court's precedent, *see Smith v. Cupp*, 430 F.3d 766, 774 (6th Cir. 2005), the right is clearly established.

* * * *

Viewing the allegations in the light most favorable to the Estate and accepting the facts and drawing all reasonable inferences from those facts in favor of the Estate, the Complaint "adequately alleges the commission of acts that violated clearly established law." *See Rondigo*, 641 F.3d at 681 (noting that our review is limited to only whether the complaint adequately alleges the commission of acts that violated established law).

The Complaint alleges disturbing conduct on the part of the MPD officers and Armstrong. We are mindful that officers are often forced to make "split-second judgment[s]" in circumstances that are "tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 397 (1989). And the law rightly protects them when they make objectively reasonable

---

Armstrong ratified misconduct in his own department by "rubber stamp[ing]" such misconduct in internal investigations, and knowingly acquiesced in such conduct.

mistakes. *See id.* 396−97. Section 1983, however, seeks to hold officials accountable where they "exercise power irresponsibly." *Pearson*, 555 U.S. at 231.

It is worth noting that § 1983 originated as a part of the Ku Klux Klan Act of 1871. *See United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 839 & 839 n.1 (1983) (Blackmun, J., dissenting); *see also Griffin v. Breckenridge*, 403 U.S. 88, 99 (1971). One of the original purposes of § 1983 was to "impose a 'duty of protection' on local officials[;] a duty to protect blacks from the night riders and others who systematically deprive[d] them of their civil rights." *Hays*, 668 F.2d at 876 (Merritt, J., dissenting); *see also District of Columbia v. Carter*, 409 U.S. 418, 426 (1973) (noting that § 1983 was "designed primarily in response to the unwillingness or inability of the state governments to enforce their own laws against those violating the civil rights of others"). In other words, government officials were failing to hold white citizens accountable for violating the civil rights of black citizens. In discussing what is now known as § 1983 in the late 1800s, Congressman Hoar of Massachusetts summed up the need for a "duty of protection":

> [For example,] [i]f every sheriff in South Carolina refuses to [hold persons accountable for wrongs allegedly committed against] a colored man and those sheriffs are kept in office year after year by the people of South Carolina, and no verdict against them for their *failure of duty* can be obtained before a South Carolina jury, the State of South Carolina, through the class of officers who are [tasked with affording] the equal protection of the laws . . . has denied that protection.

*Carter*, 409 U.S. at 427 (emphasis added).

The words of Congressman Hoar capture the essence of the issue before the Court today, well over a century later. This fact is both ironic and disappointing. There is no doubt that several cities in this nation today are in a state of crisis regarding civilian and police relations. Here, we have allegations that a government official with supervisory responsibility ratified the conduct of officers who shoot first and make judgments later, evincing a brazen disregard for human life. Ratification of such conduct is abhorrent. It not only flouts accountability, but it undermines the integrity of our justice system. Where internal investigations repeatedly yield only "rubber stamps" of approval for unconstitutional conduct, it sends the message that human beings are not being killed by accident—they are being killed by design. The law simply does

not allow government officials to use qualified immunity to escape liability for such wrongs. At this stage of the proceedings, it is not known whether the Estate will be able to sustain these allegations, but it is clear that the facts alleged in the Complaint set forth a plausible claim of supervisory liability.

The sufficiency of the complaint requires rejection of Armstrong's claim of qualified immunity at the dismissal stage. Importantly, the law does not impose too heavy a burden on the litigant at this early stage of the proceedings. It would be a perversion of justice to allow a person who might be crippled by officials acting under color of state law to then be crippled by the courts during the infancy of his or her case.

### III. CONCLUSION

For the foregoing reasons, the decision of the district court is **AFFIRMED**. The case is **REMANDED** to the district court for further proceedings.