NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0378n.06

Nos. 22-5542/5543/5544

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 15, 2023
DEBORAH S. HUNT, Clerk

KESHA GRAY,

      Plaintiff-Appellee,

v.

SHELBY COUNTY, TENNESSEE, et al.,

      Defendants,

BRETT BARNETT (22-5542); BRET SIMONSEN (22-5543); EUGENIA SUMNER (22-5544),

      Defendants-Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE

OPINION

---

Before: SILER, KETHLEDGE, WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Officers Brett Barnett, Bret Simonsen, and Eugenia Sumner appeal the denial of their motions for summary judgment based on qualified immunity in this action brought by Kesha Gray alleging unreasonable-seizure and false-arrest claims against all three officers and an excessive-force claim against Barnett. We AFFIRM IN PART and REVERSE IN PART.

I.

On March 29, 2020, Defendant Shelby County Deputy Brett Barnett responded to a disturbance call regarding a male and a female engaged in a domestic dispute on the side of a road. The caller—Christopher Hodge—stated that the male had the female in a chokehold or headlock and was punching her in the face. Hodge added that he tried to intervene, but the male threatened

him, so he (Hodge) pulled out a gun, leading the male to drive away without the female, leaving her on the side of the road.

Upon arriving at the scene, Barnett spoke with Hodge, who repeated what he had told the 911-operator. Barnett then located Plaintiff Kesha Gray, who matched the description of the female and was walking along the road. Barnett asked Gray what happened, and Gray explained that she and her fiancé had a heated verbal argument. Gray showed Barnett her arms and hands, indicating that she did not have any bruises, scratches, or other signs of a physical altercation. Barnett told Gray that Tennessee law required him to document all domestic-violence incidents and Gray responded that she would provide no identifying information or statement.

Barnett returned to his police vehicle and called his supervisor, Defendant Sergeant Eugenia Sumner. Barnett recounted the differences in the facts as told by Hodge and Gray. Barnett finished by telling Sumner that Gray said "she didn't call [the police], she's not under arrest, and she has the right not to say anything." R.72-1 Ex. 1 at 5:26 – 7:55. Sumner replied, "That's true, that's true." *Id.* Sumner then asked, "Everybody says she's the victim?" and Barnett answered yes – at least according to Hodge, who was the only witness and who had "pulled a pistol" on Gray's fiancé. *Id.* Sumner directed Barnett to keep an eye on Gray while Sumner called the General Investigations Bureau to figure out what to do.

Sumner called Defendant Sergeant Bret Simonsen and explained the situation. Simonsen advised Sumner "to detain [Gray] for further investigation" and "to identify her." R.72-2 PID 592. Simonsen stated that Gray had "a duty to help with the investigation." *Id.* Sumner called Barnett back and told him to hold Gray for questioning.

Barnett radioed for backup, explaining that Gray will have an attitude and that he is "probably going to have to fight her to get her information." R.72-1 Ex. 1 at 5:26 – 7:55. Barnett

then exited his vehicle, approached Gray, and asked for identification. Gray again refused. Barnett asked, "Do I need to detain you?" and Gray kept walking away. *Id.* Barnett pulled out his handcuffs, sped up, grabbed Gray's left wrist and attempted to handcuff her. Gray successfully pulled away. Barnett re-engaged her five more times but was unsuccessful in handcuffing her. Barnett then lunged at Gray and wrapped his arms around her. The two grappled for roughly twenty seconds. Gray broke free and continued to walk home with Barnett in tow.

Officers Price and Foster arrived and helped Barnett surround Gray and successfully tackle her to the ground. Gray pleaded with them to stop, telling them that she was pregnant. They handcuffed her, picked her up off the ground, and placed her in a police vehicle. Sumner arrived later, and, while Gray remained in the police car, the officers began to discuss charges. Gray was charged with assault, disorderly conduct, obstructing a highway or passageway, and resisting official detention. She was held in jail for twelve hours. Gray suffered a miscarriage soon after, and all the charges against her were dropped.

Gray brought this action against Barnett, Sumner, and Simonsen, among others. As relevant to this appeal, Gray asserted unreasonable-seizure and false-arrest claims against the three appellants and also an excessive-force claim against Barnett. Defendants moved for summary judgment based on qualified immunity. The district court determined that qualified immunity did not shield Barnett, Sumner and Simonsen from the unreasonable-seizure and false-arrest claims, nor Barnett from the excessive-force claim, and denied summary judgment. Defendants timely appealed.

II.

"While most denials of summary judgment are nonfinal orders which cannot be appealed pursuant to 28 U.S.C. § 1291, it is well established that an order denying qualified immunity is

immediately appealable." *Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008). However, this court's jurisdiction in reviewing qualified-immunity denials is limited. *Coffey v. Carroll*, 933 F.3d 577, 583-84 (6th Cir. 2019). We may "entertain the officers' arguments only to the extent they challenge the district court's legal determinations" and "'must ignore the defendant's attempts to dispute the facts' as read by the district court." *Id.* (quoting *Bunkley v. City of Detroit*, 902 F.3d 552, 560 (6th Cir. 2018)). That said, "we honor qualified immunity's principles by considering" uncontroverted video evidence in the record. *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022); *Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015) ("Where the police dash-cam videos depict all of the genuinely disputed facts, we view the facts in the light depicted by the videotapes." (cleaned up)).

Qualified immunity shields public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). It is an "*immunity from suit*," not a "mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original). This immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," "protect[ing] 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

A "plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011). With this burden in mind, "a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the

defendant violated a constitutional right; and (2) the right was clearly established."[1]  *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (quoting *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011)).  The inquiry may be conducted in any order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up).  "To determine whether a constitutional right is clearly established, we must look first to decisions of the Supreme Court, then to decisions of this Court and other courts within our circuit, and finally to decisions of other circuits."  *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898 (6th Cir. 2019) (alteration omitted) (quoting *Crawford v. Geiger*, 656 F. App'x 190, 198 (6th Cir. 2016)).  This inquiry does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *al-Kidd*, 563 U.S. at 741 (citations omitted).  "[I]n an obvious case," the law can be clearly established "even without a body of relevant case law."  *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).

## III.

Barnett argues the district court erred in not recognizing his qualified immunity from Gray's unreasonable-seizure, false-arrest, and excessive-force claims.

---

[1]  Prior to *Pearson v. Callahan*, 555 U.S. 223 (2009), we "attributed a third prong of 'objective unreasonableness' to the qualified immunity analysis."  *Brown v. Lewis*, 779 F.3d 401, 417 (6th Cir. 2015) (citing *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)).  We have since corrected course, observing that "there is no additional, separate hurdle of reasonableness for [a plaintiff] to overcome" and dispensing with the third prong.  *Id.*  Accordingly, we reject Barnett's argument that we must also find his conduct "objectively unreasonable" in order to deny him qualified immunity.  Case No. 22-5542 Appellant Br. at 33-35 (quoting *Feathers*, 319 F.3d at 851).

A.

Because Gray's Amended Complaint does not assert separate unreasonable-seizure and false-arrest claims, the district court analyzed Barnett's qualified immunity from both together. R.121 PID 1240 n.2 ("Gray's false arrest claim is included within a broader, unreasonable seizure claim."). We do so as well. We undertake the qualified-immunity inquiry in the ordinary sequence, first assessing whether Barnett violated a constitutional right and then assessing whether the right was clearly established.

1.

The Fourth Amendment prohibits "unreasonable . . . seizures" to protect "[t]he right of the people to be secure in their persons." U.S. Const. amend. IV. Accordingly, we must first determine whether Barnett seized Gray and, if so, whether the seizure was unreasonable.

When an officer detains an individual "for the purpose of requiring him to identify himself," the officer "perform[s] a seizure of his person subject to the requirements of the Fourth Amendment." *Brown v. Texas*, 443 U.S. 47, 50 (1979). "The application of physical force to the body of a person with intent to restrain is a seizure, even if the force does not succeed in subduing the person." *Torres v. Madrid*, 141 S. Ct. 989, 994 (2021). "[B]rief seizures are seizures all the same." *Id.* at 999. Accordingly, when Barnett grabbed Gray's hands, lunged at her, wrapped his arms around her, and grappled with her for roughly twenty seconds, he seized her, notwithstanding her evading capture. Barnett's "conduct would have communicated to a reasonable person that [she] was not at liberty to ignore the police presence and go about [her] business." *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)).

"To determine if a search or seizure was unreasonable, and thus unconstitutional, courts balance the degree of intrusion on the individual's interests against 'the importance of the

governmental interests alleged to justify the intrusion.'" *Colson v. City of Alcoa*, 37 F.4th 1182, 1186 (6th Cir. 2022) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). This balance involves weighing "[i] the gravity of the public concerns served by the seizure, [ii] the degree to which the seizure advances the public interest, and [iii] the severity of the interference with individual liberty." *Brown*, 443 U.S. at 50-51. To find a seizure reasonable under the *Brown* test, there "must be . . . specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Id.* "In the absence of any basis for suspecting [the detainee] of misconduct"—as is the case here—"the balance between the public interest and [the detainee's] right to personal security and privacy tilts in favor of freedom from police interference." *Id.* at 52.

Under the first *Brown* factor, the graver the public concerns underlying seizure, the more likely the seizure is reasonable. We agree with Barnett that domestic violence is of grave public concern and, as such, this factor favors finding Barnett's seizure reasonable.

The second *Brown* factor, however, strongly weighs against finding Barnett's seizure reasonable. The public's interest against domestic violence revolves around the victim's well-being. Tennessee's domestic abuse statute expressly makes this point in its "legislative intent" provision, which states: "[T]he general assembly intends that the official response to domestic abuse shall stress enforcing the laws to *protect the victim and prevent further harm to the victim . . . .*" Tenn. Code Ann. § 36-3-618 (emphasis added). In another provision, the statute expressly states: "Arrest is the preferred response only with respect to the primary aggressor." *Id.* § 36-3-619(b). The law does not suggest that police physically forcing suspected domestic-

violence victims to cooperate advances the cause against domestic violence. That practice inflicts—not prevents—harm.

In evaluating this second factor, we reject Barnett's emphasis on Gray's status as a witness to a crime because a state's "interest in detaining witnesses for information is of relatively low value." *Maxwell v. County of San Diego*, 708 F.3d 1075, 1084 (9th Cir. 2013) (discussing *United States v. Ward*, 488 F.2d 162, 169 (9th Cir. 1973) (en banc)). We also reject Barnett's suggestion that the seizure advanced the public interest because it enabled him to file a "statutorily mandated report" required by Tennessee Code Annotated § 36-3-619(e). Case No. 22-5542 Appellant Br. at 29. That provision reads:

> When a law enforcement officer investigates an allegation that domestic abuse occurred, the officer shall make a complete report and file the report with the officer's supervisor in a manner that will permit data on domestic abuse cases to be compiled. If a law enforcement officer decides not to make an arrest or decides to arrest two (2) or more parties, the officer shall include in the report the grounds for not arresting anyone or for arresting two (2) or more parties.

Tenn. Code Ann. § 36-3-619(e). Nothing in this statute requires a victim to identify herself to an officer nor obliges anyone to help the officer prepare his report. In this instance, the public's interest in law enforcement's ability to file paperwork is too minimal to support seizing a domestic-violence victim – especially considering that the duty comes from a statute seeking to protect such victims.

The third *Brown* factor suggests that the more severe an interference with individual liberty, the more likely a seizure is unreasonable. Even assuming Barnett is correct—that, for the unreasonable seizure claim, "the interaction in question consists of the two (2) minutes immediately preceding [Officers] Price and Foster's arrival," Case No. 22-5542 Appellant Br. at 12—his interference was aggressive. In *Illinois v. Lidster*, the Supreme Court concluded that subjecting all motorists to a "systematic[]" and short highway stop was reasonable, in part because

it "provided little reason for anxiety or alarm." 540 U.S. 419, 428 (2004). A crime victim would, however, have good reason for anxiety and alarm when, despite no one disputing her innocence, the police target her, chase her, attempt to handcuff her, lunge at her, wrap their arms around her, and grapple with her. At best, this factor is neutral.

We conclude that there is no reason to depart from *Brown*'s observation that, "[i]n the absence of any basis for suspecting [the detainee] of misconduct, the balance between the public interest and [the detainee's] right to personal security and privacy tilts in favor of freedom from police interference." *Brown*, 443 U.S. at 52. Because Barnett's seizure was unreasonable, he violated Gray's constitutional rights. Thus, the first prong of the qualified immunity test is satisfied.

2.

Turning to the clearly-established prong, the present circumstances exemplify an "'obvious case' where general 'standards can clearly establish the answer, even without a body of relevant case law.'" *Colson*, 37 F.4th at 1189 (quoting *Rivas-Villegas v. Cortesluna*, -- U.S. -- , 142 S. Ct. 4, 8 (2021) (per curiam)). The Supreme Court's observations have put the question beyond debate. *See al-Kidd*, 563 U.S. at 741.

In 1969, the Supreme Court remarked that it was a "*settled principle* that while the police have the right to request citizens to answer voluntarily questions concerning unsolved crimes[,] they have no right to compel them to answer." *Davis v. Mississippi*, 394 U.S. 721, 727 n.6 (1969) (emphasis added); *id.* at 726-27 ("*Nothing is more clear* than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'" (emphasis added)). Ten years later, the *Brown* Court expressly concluded that

-9-

> [E]ven assuming that [the public's interest in preventing crime] is served to some degree by stopping and *demanding identification* from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it.

443 U.S. at 52 (emphasis added). Four years after that, in *Florida v. Royer*, the Supreme Court again observed that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen," but the person questioned "may not be detained *even momentarily* without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." 460 U.S. 491, 497-98 (1983) (plurality opinion) (emphasis added); *see also Bostick*, 501 U.S. at 437 ("We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."); *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (reiterating the observations made in *Royer* and *Bostick*). In 2002, the Supreme Court noted that law enforcement "may pose questions" to and "*ask for identification*" from an individual without a "basis for suspecting [that] particular individual" of criminal conduct "provided [that] they do not induce cooperation by coercive means." *United States v. Drayton*, 536 U.S. 194, 201 (2002) (emphasis added).

Put together: No reasonable officer can question the "settled principle" that he may not "approach an individual on the street," "demand[] identification" from that person—for which there is no suspicion that she engaged in criminal activity herself—and forcibly detain her "even momentarily" in order to "induce [her] cooperation." The Supreme Court's decades of precedent are unequivocal, and it is unreasonable not to apply this Fourth Amendment protection to those who are in most need of it: innocents known to the police to have information relevant to an investigation, *i.e.*, known witnesses and victims. It is beyond debate that the Fourth Amendment

prohibits Barnett's actions. *See Davis v. Dawson*, 33 F.4th 993, 1005 (8th Cir. 2022) (Stras, J., concurring) ("We once again reject the argument that investigatory need justifies suspicionless seizures. No Fourth Amendment principle is more clearly established."); *see also* R.72-1 Ex. 1 at 7:31 – 7:40 (Barnett recounting that Gray said "she didn't call [the police], she's not under arrest, and she has the right not to say anything," and Sumner responding, "That's true, that's true").

We also reject the argument that *Illinois v. Lidster*, 540 U.S. 419 (2004), would lead a reasonable officer to doubt the unconstitutionality of the conduct here. In *Lidster*, the Supreme Court considered highway-checkpoint stops during which the police asked motorists for information about a fatal hit-and-run. *Id.* at 421; *id.* at 423 ("The stop's primary law enforcement purpose was . . . to ask vehicle occupants, as members of the public, for their help in providing information about a crime in all likelihood committed by others."). The Court recognized that police have a right to "solicit[] the public's assistance" in investigating a crime. *Id.* at 425-26. It also recognized a practical difference between soliciting that help from motorists and from pedestrians. *Id.* Police "need to stop a motorist" to ask for help, but that "need"—*i.e.*, the need to stop—is "less likely present where a pedestrian, not a motorist, is involved." *Id.* at 425. To avoid the "anomalous" result where police could "freely [] seek the voluntary cooperation of pedestrians" but not "seek similar voluntary cooperation from motorists," the Court held that such highway-checkpoint stops are constitutional. *Id.* at 426. *Lidster* says that police may stop *motorists* in order to solicit their assistance; it does not say anything with respect to what police can or cannot do to pedestrians. *See* Kit Kinports, Camreta *and* al-Kidd: *The Supreme Court, the Fourth Amendment, and Witnesses*, 102 J. Crim. L. & Criminology 283, 305-06 (2012) ("But the practical reality constraining both the police and the Court in *Lidster*—that the only way to 'approach[]' drivers and ask if they are 'willing to answer some questions' is to 'seize' them—applies only in cases

where witnesses are on the road." (quoting *Lidster*, 540 U.S. at 425)). Additionally, *Lidster* is factually inapposite in that police "simply" requested information and distributed a flyer. 540 U.S. at 428. There is no suggestion that police further detained motorists who declined to give information. *See id.* ("And there is no allegation here that the police acted in a[n] . . . unlawful manner while questioning motorists during stops.").

It is true that we have previously recognized that "even absent particularized reasonable suspicion, innocent bystanders may be temporarily detained where necessary to secure the scene of a valid search or arrest and ensure the safety of officers and others." *Bletz*, 641 F.3d at 755. But that is not what happened here, and that is not the reason Barnett cites for his detention of Gray. No reasonable officer in Barnett's shoes would believe he needed to detain Gray to secure the scene of a valid search or arrest or to ensure the safety of officers or others. When Barnett sought to detain Gray, the area was not the scene of a valid search or arrest. No person's safety was in jeopardy either, notwithstanding a confrontation with a gun, because a reasonable officer would know—as Barnett did—that Hodge possessed the gun and that he was giving his information to other officers. Nor was Gray's safety reasonably in question, considering her abuser had fled – and especially considering that Gray emphasized that the altercation was entirely verbal and showed that she had no indicia of physical injury.

We also reject any argument that Barnett is entitled to qualified immunity because he was simply following Sumner's orders. In *Bunkley v. City of Detroit*, we observed that officers may be entitled to qualified immunity in situations where "'reasonable officers' could conclude that they have probable cause for an arrest based on 'plausible instructions' from a supervisor when 'viewed objectively' in light of their own knowledge of the surrounding facts and circumstances." 902 F.3d 552, 562 (6th Cir. 2018) (quoting *Anthony v. City of New York*, 339 F.3d 129, 138 (2d Cir.

2003)). Sumner's instructions are not enough; reasonable officers must consider the known facts and circumstances. No officer, knowing what Barnett knew, would think he could seize Gray.[2]

Accordingly, we affirm the denial of Barnett's motion for qualified immunity as to Gray's unreasonable-seizure and false-arrest claims.

### B.

In contrast, Barnett's motion for summary judgment on Gray's excessive-force claim based on qualified immunity should have been granted. To reach this conclusion we need only analyze whether Barnett's actions violated Gray's constitutional rights. Our analysis is factually confined to the events preceding the arrival of Barnett's backup. *See* R.121 PID 1251-52 (distinguishing between the "First Incident" and the "Second Incident").

As a preliminary matter, we identify a flaw in the theory behind Gray's excessive-force claim. Gray argues on appeal that because Barnett had no individualized suspicion that Gray had engaged or would be engaging in criminal conduct, he "was therefore not justified in using *any* force against her." Case No. 22-5542 Appellee Br. at 23 (emphasis in original). Essentially, Gray contends that any force used to falsely arrest is per se excessive. But false-arrest claims and excessive-force claims are "distinct, [such that] establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa." *Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004). In other words, "a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." *Bashir v. Rockdale County*, 445 F.3d 1323, 1331 (11th Cir. 2006) (quoting *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000)). "When properly stated, an excessive force

---

[2]     In his declaration, Barnett avers that he "believed that [his] superiors had more information or knowledge than [he] did regarding the situation." R.88-1 PID 762. On Gray's facts, that belief was unreasonable.

claim . . . relat[es] to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest." *Id.* at 1332; *see also Gerling v. City of Hermann*, 2 F.4th 737, 743-44 (8th Cir. 2021). Courts "must therefore analyze the excessive force claim without regard to whether the arrest itself was justified." *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007) (citing *Cortez v. McCauley*, 478 F.3d 1108, 1126 (10th Cir. 2007) (en banc) ("[I]n a case where police effect an arrest without probable cause . . . but use no more force than would have been reasonably necessary if the arrest or detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.")). We join our sister circuits and conclude that force is not per se excessive when used to make a false arrest. *E.g.*, *Sebright v. City of Rockford*, 585 F. App'x 905, 907 (7th Cir. 2014) (citing, among other cases, *Snell v. City of York*, 564 F.3d 659, 672-73 (3d Cir. 2009), and *Jones v. Parmley*, 465 F.3d 46, 61-62 (2d Cir. 2006)); *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1024 n.13 (9th Cir. 2015).

To determine whether force is excessive, courts "employ an objective-reasonableness test, asking 'whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Estate of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017) (quoting *Graham*, 490 U.S. at 397). It is a "fact-intensive inquiry," *Jones v. City of Elyria*, 947 F.3d 905, 916-17 (6th Cir. 2020), with the "overarching determination" being "whether the 'totality of the circumstances' justified the degree of force an officer used," *Shanaberg v. Licking County*, 936 F.3d 453, 456 (6th Cir. 2019) (quoting *Bletz*, 641 F.3d at 751). We assess the situation from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) (quoting *Graham*, 490 U.S. at 396).

Barnett employed an objectively reasonable amount of force to arrest Gray. The uncontroverted video evidence shows Barnett grabbing or attempting to grab Gray's hands six times. With minimal effort, Gray successfully shrugs Barnett off each time. Barnett also lunges at Gray, wraps his arms around her, and tries to pin Gray's left arm to her back and handcuff her. But, after about 20 seconds, Gray escaped Barnett's hold by spinning away from him. Barnett used more force in this latter part of the interaction than he did prior, but we cannot conclude it was an objectively unreasonable amount of force. "[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Saucier v. Katz*, 533 U.S. 194, 209 (2001) (quoting *Graham*, 490 U.S. at 396). "The right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 687 (6th Cir. 2006) (cleaned up) (quoting *Graham*, 490 U.S. at 396). As recognized in *Burchett v. Kiefer*, the minimal use of force to handcuff someone is not excessive when that individual "twist[s] and turn[s] some," "ke[eping] one arm out" and preventing officers from "bring[ing] it down." 310 F.3d 937, 940, 944 (6th Cir. 2002).

Gray does not cite any cases suggesting Barnett's actions were objectively unreasonable, instead reiterating her flawed legal theory. The district court relied on *Smith v. City of Troy*, 874 F.3d 938 (6th Cir. 2017), to conclude that "Barnett's use of force was excessive," R.121 PID 1251 (citing *Smith*, 874 F.3d at 945). Although this case and *Smith* involve the "forcible handcuffing" of an individual who committed no crime and presented no safety risk, there is a key difference. 874 F.3d at 944-45. In *Smith*, the officer "violated Smith's right to be free from excessive force when he took Smith to the ground with a leg sweep and landed on top of Smith." *Id.* Barnett did

not employ a comparable amount of force; Gray was not taken to the ground during her encounter with Barnett prior to his backup arriving.

Because Barnett used an objectively reasonable amount of force, he did not violate Gray's constitutional rights and is entitled to qualified immunity from Gray's excessive-force claim.

IV.

Gray asserts unreasonable-seizure and false-arrest claims against Sumner for ordering Barnett to detain Gray, and against Simonsen for directing Sumner to order Barnett to detain Gray. Such claims require a plaintiff to prove that "the arresting officer" lacked a constitutional basis to seize or arrest the plaintiff. *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005).

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Supervisors must commit "some 'active unconstitutional behavior'" to be liable. *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016). "Active behavior" does not mean "physically put[ting] hands on the injured party or even physically being present at the time of the constitutional violation." *Id.* at 242 (alterations omitted). Active behavior can consist of "encourag[ing] the specific incident of misconduct or in some other way directly participat[ing] in it," *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984), or "implicitly authoriz[ing], approv[ing], or knowingly acquiesc[ing] in the unconstitutional conduct of the offending officers," *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982)); *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021). Such active behavior "must be both a cause in fact and a proximate cause of the alleged injury." *Crawford*, 15 F.4th at 762.

Qualified immunity can protect against claims of supervisory liability. As in ordinary § 1983 cases, to overcome a claim of qualified immunity, a plaintiff must show that the supervisor's own behavior violated her constitutional rights. But the doctrine is modified at the clearly established prong. A plaintiff "need only show that the right that [the subordinate] violated was clearly established at the time of the violation." *Peatross*, 818 F.3d at 245 (first quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999), and then citing *Coley v. Lucas County*, 799 F.3d 530, 539-41 (6th Cir. 2015)).

Gray contends that Sumner knew that Hodge pulled the gun and that Sumner relayed that information to Simonsen. Sumner and Simonsen contend that Sumner believed Gray's fiancé pulled the gun and relayed that information to Simonsen. The district court did not decide whose version of events is true. Instead, it concluded that Sumner and Simonsen were not entitled to qualified immunity "[u]nder either scenario." R.121 PID 1246-47. The district court, therefore, viewed Sumner's knowledge and what she told Simonsen as immaterial facts. *George v. Youngstown State Univ.*, 966 F.3d 446, 458 (6th Cir. 2020) ("A 'material' fact is one that 'might affect the outcome of the suit under the governing law.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). We disagree with that legal determination. Sumner's understanding of the events and what she told Simonsen might be relevant to whether either or both committed a constitutional violation, *e.g.*, they engaged in active unconstitutional behavior. *Shehee*, 199 F.3d at 300 ("knowing acquiescence").

In any event, what Sumner knew and told Simonsen are open factual questions not answered by the district court, and we are without jurisdiction to answer them in this interlocutory appeal of a denial of summary judgment based on qualified immunity. *Coffey*, 933 F.3d at 583-84.

To the extent Sumner and Simonsen contend that they still have qualified immunity under Gray's version of the facts, they are mistaken. *See Ouza v. City of Dearborn Heights*, 969 F.3d 265, 277 (6th Cir. 2020) ("[T]to bring an interlocutory appeal of a qualified immunity ruling, the defendant must be willing to concede the plaintiff's version of the facts for purposes of the appeal." (quoting *Jefferson v. Lewis*, 594 F.3d 454, 459 (6th Cir. 2010))). Gray's theory is that Sumner knew that Hodge pulled the pistol on Gray's fiancé, R.72-1 Ex. 2 at 5:26 – 7:55, and told Simonsen the same, R.72-2 PID 591-92. If true, Sumner and Simonsen both knew what Barnett knew: that there was no gunman on the loose and that Gray was simply a noncooperative victim or witness whom they lacked a constitutional basis to seize. R.72-1 Ex. 1 at 7:31 – 7:40 (Sumner responding, "that's true, that's true" when Barnett told her that Gray said "she didn't call [the police], she's not under arrest, and she has the right not to say anything"). And if they had knowledge of these facts, Simonsen (in directing Sumner) and Sumner (in directing Barnett) engaged in active unconstitutional behavior, in that they (at the very least) authorized, approved, or knowingly acquiesced in Barnett's unconstitutional seizure. *See, e.g.*, *Bennett v. City of Eastpointe*, 410 F.3d 810, 820-21 (6th Cir. 2005) (summary judgment on § 1983 supervisory liability claim denied to chief of police who "instructed his officers to investigate any black[] youths riding through Eastpointe"); *Stillwagon v. City of Delaware*, 747 F. App'x 361, 374-75 (6th Cir. 2018) (summary judgment denied on § 1983 supervisory liability claim to detective sergeant who "ordered [an officer] to direct [another] to file the criminal complaint against" the plaintiff and "approved the steps they were taking to investigate the case"); *Keating v. City of Miami*, 598 F.3d 753, 763-64 (11th Cir. 2010) (supervisory liability under § 1983 plausibly alleged against police chief who "approved orders permitting the police [] to advance while beating unarmed demonstrators and discharging projectiles and tear gas," and against police captain who "directed the police [] to

begin discharging weapons at the unarmed demonstrators"). Because we earlier concluded that Barnett violated Gray's clearly established constitutional rights in seizing Gray, Gray has satisfied her burden to overcome Sumner and Simonsen's assertions of qualified immunity at this juncture.

V.

For these reasons, we **AFFIRM** the district court's denial of qualified immunity to Barnett, Sumner, and Simonsen with respect to Gray's unreasonable-seizure and false-arrest claims, and **REVERSE** the district court's denial of qualified immunity to Barnett with respect to Gray's excessive force claim.