RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0082p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JORDAN VENEMA, as personal representative of the
estate of Tyler Venema, deceased,

                    *Plaintiff-Appellee*,

    *v.*

FRED WEST and CURTIS KEYS,

                    *Defendants*,

JODI L. DEANGELO, Warden,

                    *Defendant-Appellant*.

No. 23-1467

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Flint.
No. 4:21-cv-12246—Shalina D. Kumar, District Judge.

Decided and Filed: April 3, 2025

Before: CLAY, WHITE, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:** John L. Thurber, Joshua S. Smith, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Matthew D. Klakulak, Andrew J. Laurila, GIROUX PAPPAS TRIAL ATTORNEYS, Southfield, Michigan, for Appellee.

    CLAY, J., delivered the opinion of the court in which WHITE, J., concurred. NALBANDIAN, J. (pp. 16–22), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

CLAY, Circuit Judge. This civil rights action arises from the suicide of Tyler Venema. Venema asphyxiated himself with a plastic bag while in the custody of the Michigan Department of Corrections ("MDOC") and in an inpatient mental health treatment program at Woodland Center Correctional Facility ("WCC"). Defendant Jodi DeAngelo was the warden of WCC at the time of Venema's death. Venema's Estate sued DeAngelo in her individual capacity pursuant to 42 U.S.C. § 1983, alleging that DeAngelo was liable for Venema's death in violation of the Eighth Amendment. Asserting the defense of qualified immunity, DeAngelo moved to dismiss the claim against her. The district court denied the motion, concluding that DeAngelo was not entitled to qualified immunity. DeAngelo timely appealed. For the reasons set forth below, we affirm.

## I. BACKGROUND

### A. Factual History

The Estate alleges the following relevant facts in the Second Amended Complaint ("SAC"), the relevant pleading in this case.[1] Venema was incarcerated in MDOC custody for thirty-two months, from October 20, 2014, until his death on June 27, 2017. While he was incarcerated, MDOC medical personnel diagnosed Venema with several mental illnesses, including schizophrenia. Medical personnel documented in Venema's MDOC inmate file that Venema had a history of self-injurious behaviors and suicidal ideations, and that he had previously attempted suicide. In one attempt, he placed a bag over his head. In another, he hanged himself using a bed sheet. Venema's history of suicide attempts was well-documented and known to the corrections staff at WCC.

---

[1]Because DeAngelo is appealing the denial of a motion to dismiss, the Court accepts as true the well-pleaded factual allegations in the Complaint. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

Because of his suicidal behavior and mental illnesses, Venema was placed under close observation or involuntary treatment orders by MDOC staff multiple times during his incarceration. In June 2017, he was under a ninety-day involuntary treatment order set to expire on July 15, 2017. While under the order, on June 20, 2017, he was deemed to be mentally decompensating[2], and as a result, was transferred from a residential treatment program at Gus Harrison Correctional Facility to an inpatient treatment program at WCC.

On his first day at WCC, a social worker classified Venema as a "MODERATE RISK of suicide or self-injury." SAC, R. 25, Page ID #191. Pursuant to that classification, Venema was issued a Mental Health Management Plan ("MHMP"). The MHMP instructed MDOC housing unit staff to issue Venema a suicide-prevention gown and blanket, and prohibited him from possessing personal property, bedding, and writing implements. The MHMP further instructed staff to "observe and report" certain behaviors, including "[s]elf-harm, attempts at self-harm, or verbalized threats of self-harm." *Id.* And the MHMP instructed that staff should:

> Notify MH of any further self-harm or threats of self harm
>
> Remain in close proximity, intervene immediately should prisoner engage in self-injurious behavior
>
> Search prisoner and surrounding area for dangerous contraband during every shift
>
> Utilize therapeutic communication and de-escalation techniques when engaging prisoner
>
> Report the aforementioned behaviors to the Treatment Team

*Id.* at Page ID #192.

Three days after he was first assessed at WCC, on June 23, 2017, Venema was re-assessed as an "INTERMEDIATE RISK of suicide or self-injury" in a new MHMP. The new MHMP repeated the instructions to staff included in the first MHMP, including to "observe and report" self-harm, attempted self-harm, or threats of self-harm; to "[r]emain in close proximity;"

---

[2]Decompensation refers to "a breakdown in an individual's defense mechanisms, resulting in progressive loss of normal functioning or worsening of psychiatric symptoms." Am. Psych. Ass'n, *Decompensate*, Dictionary of Psych., https://dictionary.apa.org/decompensation [https://perma.cc/G24P-UBZE].

to "intervene immediately . . . in self-injurious behavior;" and to "[s]earch [Venema] and [his] surrounding area for dangerous contraband during every shift." *Id.* at Page ID #192.

Defendants Fred West and Curtis Keys were corrections officers working as WCC housing unit staff members. On June 23, 2017, they were performing rounds on Venema's housing unit, Pod 9. That day, West and/or Keys returned Venema's clothing to him in a plastic bag, despite knowing that the plastic bag was a potential suicide tool and considered dangerous contraband for prisoners at risk of self-harm. West and Keys performed rounds on Pod 9 throughout their shifts that day but failed to remove the plastic bag from Venema's cell. Eventually, West found Venema unresponsive in his cell with the plastic bag over his head. He had no pulse and was not breathing. The Estate alleges that given Venema's "physical state" at the time of West's discovery, Venema "had been in his cell with the plastic bag over his head for a significant period of time." *Id.* at Page ID #195.

Venema was transported to the hospital, where he was placed on life support and died on June 27, 2017. An autopsy determined the cause of death to be asphyxia due to suffocation with a plastic bag and the manner of death to be suicide. According to the Complaint, if "Venema had received timely medical intervention . . . more likely than not, [he] would have survived." *Id.* at Page ID #198.

The Estate alleges that Keys and West deprived Venema of his Eighth Amendment rights by recklessly disregarding Venema's "serious risk of harm," and his "serious medical needs that posed an obvious risk of substantial harm." *Id.* at Page ID #198–99.

During Venema's incarceration at WCC, Defendant Jodi DeAngelo was the warden of the facility. As warden of WCC, DeAngelo was responsible for the "supervision and oversight of [its] corrections officers," the "administration of custodial[] [and] treatment . . . programs" at the facility, and the determination and implementation of facility policy. *Id.* at Page ID #188–89. As to DeAngelo's supervision over staff, the Estate specifically alleges that she "ensure[d] completion of mandatory training for all staff," "ensure[d] [staff] adherence to departmental policies and procedures," and was "directly responsible for . . . the recruitment, supervision, and

discipline of . . . Corrections Officers . . . including, but not limited to Defendants West and Keys." *Id.* at Page ID #188–89.  DeAngelo determined, wrote, or approved policies for WCC.

The Estate further alleges that DeAngelo knew that (1) "plastic bags were potential tools for suicide for inmates at risk of suicide or self-harm and considered dangerous contraband;" (2) "corrections officers at [WCC] were providing plastic bags to inmates at risk of suicide or self-harm;" and (3) "corrections officers at [WCC] were callously refraining from removing the plastic bags from the cells of inmates at risk of suicide or self-harm." *Id.* at Page ID #205–06.

Because of this knowledge and her control over WCC, the Estate alleges that Defendant DeAngelo "implicitly authorized, approved, or knowingly acquiesced" in the unconstitutional conduct of Keys and West; personally failed to properly train and supervise WCC corrections officers, including Keys and West; and knowingly disregarded the consequences of deficient training and supervision, "show[ing] a complete disregard" as to "whether the corrections officers at [WCC] would violate the inmates' rights to be free from serious risks of harm" foreseeably caused by the provision of plastic bags to suicidal prisoners. *Id.* at Page ID #207–11.

The Estate further alleges that there is a direct causal link between DeAngelo's "implicit authorization, approval, and/or knowing acquiescence," and the deprivation of Venema's constitutional rights.  *Id.* at Page ID #209–11.  As a direct result of DeAngelo's failure to train and supervise Keys and West, Venema was given a dangerous suicide tool and left unattended while he asphyxiated himself, allegedly in violation of his constitutional rights.

**B.  Procedural History**

The Estate filed its original Complaint against West, Keys, and DeAngelo on September 24, 2021.  It later amended the Complaint to name Venema's sibling, Jordan Venema, as personal representative of the Estate.  The now-effective Second Amended Complaint brings three claims for damages for violations of the Eighth Amendment against Defendants in their individual capacities pursuant to 42 U.S.C. § 1983.  The claims against Keys and West are identical, alleging that they violated the Eighth Amendment through deliberate indifference to Venema's serious medical needs.  The claim against DeAngelo alleges that she violated Venema's Eighth

Amendment rights by failing to adequately train and supervise the corrections officers, resulting in Venema's injury and death.

The three Defendants filed a joint motion to dismiss the Second Amended Complaint, asserting qualified immunity. As to DeAngelo, the Defendants argue that the allegations in the Complaint were insufficient to establish her personal involvement, as is necessary to overcome qualified immunity and assert a supervisory liability claim for a constitutional violation. The district court denied the motion to dismiss, and qualified immunity, as to all Defendants. The court concluded that the Complaint's allegations were sufficient to establish that "DeAngelo implicitly authorized, approved, and/or knowingly acquiesced in Keys' and West's unconstitutional conduct," thereby violating Venema's Eighth Amendment rights. Order, R. 35, Page ID #351–52. After concluding that the Complaint sufficiently alleged that DeAngelo violated Venema's constitutional rights, the district court determined that DeAngelo was not entitled to qualified immunity, because clearly established Sixth Circuit precedent provides that a prison official may not act with deliberate indifference to an inmate at a high risk of suicide. *Id.* at Page ID #352 (citing *Downard v. Martin*, 968 F.3d 594, 600 (6th Cir. 2020)).

DeAngelo timely appeals the district court's order denying Defendants' motion to dismiss. Keys and West do not appeal.

## II.  APPELLATE JURISDICTION

Generally, this Court can only review on appeal "final decisions" from district courts. 28 U.S.C. § 1291. However, "[a] district-court decision denying a Government officer's claim of qualified immunity can fall within the narrow class of appealable orders despite the absence of a final judgment." *Ashcroft v. Iqbal*, 556 U.S. 662, 671–72 (2009) (internal quotation marks omitted). But "such an appeal must only raise issues of *law*, not factual disputes." *Peatross v. City of Memphis*, 818 F.3d 233, 239 (6th Cir. 2016). In other words, for this Court to have jurisdiction over an interlocutory appeal denying qualified immunity, "the defendants must be willing to concede to the facts as alleged by the plaintiff and discuss only the legal issues raised by the case." *Id.* (internal quotation marks omitted).

In this case, the Estate moved to dismiss DeAngelo's interlocutory appeal for lack of appellate jurisdiction.  This motion was filed before the parties had submitted merits briefs.  Nevertheless, the Estate argued that DeAngelo's appeal, as argued on the merits, would raise disputed factual issues, and that we therefore lacked jurisdiction.  A panel of this Court referred the motion to dismiss the appeal to be decided along with the merits of DeAngelo's appeal, noting that it is "'normally the safest course . . . for the parties to address the jurisdictional issues along with the merits in their briefs and for this Court to postpone a final decision on jurisdiction until the case is argued.'"  Order, ECF No. 22, 2 (quoting *Berryman v. Rieger*, 150 F.3d 561, 564 (6th Cir. 1998)).  After reviewing DeAngelo's merits briefs, we conclude that DeAngelo has conceded the well-pleaded factual allegations in the Estate's Complaint for the purposes of this appeal.  Accordingly, we have jurisdiction over the appeal, and deny the Estate's motion to dismiss.  The dispute in this case is a pure question of law: whether the complaint adequately alleges that DeAngelo violated Venema's Eighth Amendment rights, and whether those rights were clearly established at the time of the violation.  *See Peatross*, 818 F.3d at 239.

## III.  DISCUSSION

### A.  Standard of Review

We review *de novo* the district court's denial of a motion to dismiss based on qualified immunity.  *Coley v. Lucas Cnty.*, 799 F.3d 530, 536 (6th Cir. 2015).  In applying that standard, we accept the allegations in the plaintiff's complaint as true and construe the allegations in the light most favorable to the plaintiff, drawing all reasonable inferences in her favor.  *Id.* at 537.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

"Although a motion [to dismiss] pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth

therein, dismissal nevertheless is appropriate when the defendant is entitled to a meritorious affirmative defense such as qualified immunity." *Peatross*, 818 F.3d at 240.

## B. Analysis

This appeal presents the question of whether DeAngelo is entitled to qualified immunity on the Estate's failure to train and supervise claim. "In determining whether government officials are entitled to qualified immunity, we conduct a two-step inquiry: first, viewing the facts in the light most favorable to the plaintiff, do the facts alleged show that the officer's conduct violated a constitutional right?" *Id.* (internal quotation marks omitted). "Second, was the right clearly established at the time of the violation?" *Id.* (internal quotation marks omitted). "[T]he plaintiff bears the burden of showing that a clearly established right has been violated and that the official's conduct caused that violation." *Id.* (alteration adopted) (internal citations and quotation marks omitted). We have the discretion to decide which prong of the inquiry to consider first. *Id.* In this appeal, we first consider whether DeAngelo's conduct violated Venema's constitutional rights.

"As we have repeatedly cautioned, it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Hart v. Hillsdale Cnty.*, 973 F.3d 627, 635 (6th Cir. 2020) (internal quotation marks omitted). It is preferable to resolve the "threshold question" of a government officer's entitlement to qualified immunity at "summary judgment[,] . . . not dismissal under Rule 12." *Id.* (internal quotation marks omitted). We are particularly cautious when considering the clearly established prong in reviewing Rule 12(b)(6) motions on qualified immunity grounds, "because development of the factual record is frequently necessary to decide whether the official's actions violated clearly established law." *Id.*

### 1. Supervisory Liability

For the purposes of this appeal, DeAngelo does not contest that Keys and West violated Venema's clearly established Eighth Amendment rights in leaving him with a plastic bag or denying him prompt medical attention. The appeal raises only the question of whether the Estate has stated a claim that DeAngelo is liable for the violation of Venema's constitutional rights

based on her failure to train and supervise corrections officers, including Keys and West—a supervisory liability claim.

An individual capacity claim based on supervisory liability, like all individual capacity claims, requires an allegation of personal liability. *See Peatross*, 818 F.3d at 240–41. Thus, "the Estate must point to a specific action of [the] individual supervisor to defeat a qualified immunity claim." *Phillips v. Roane Cnty.*, 534 F.3d 531, 544 (6th Cir. 2008). An official cannot be held liable for the constitutional violations of subordinates under a theory of *respondeat superior*, meaning that she "cannot be held liable simply because . . . she was charged with overseeing" subordinate officers who violated the plaintiff's constitutional rights. *Peatross*, 818 F.3d at 241. The complaint must plead that the official violated the Constitution through her own actions. *Iqbal*, 556 U.S. at 677.

Further, for supervisory liability to attach, there must be "more than an attenuated connection between the injury and the supervisor's alleged wrongful conduct." *Peatross*, 818 F.3d at 241. This Court requires that the plaintiff allege "some active unconstitutional behavior on the part of the supervisor," *id.* (internal quotation marks omitted), that is "directly correlated with the plaintiff's injury." *Essex v. Cnty. of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013). "[A] mere failure to act will not suffice to establish supervisory liability" in the context of a constitutional claim. *Peatross*, 818 F.3d at 241. But the supervisor need not "have physically put his hands on the injured party or even physically been present at the time of the constitutional violation" for supervisory liability for the violation to attach. *Id.* at 242. Still, "at a minimum, the plaintiff must show that the defendant at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* (internal quotation marks omitted). A supervisory official's failure to supervise, control, or train an offending subordinate is not actionable without this minimum showing. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

To hold a supervisor-defendant liable for a violation of a plaintiff's constitutional rights, there also needs to be "a causal connection between the defendant's wrongful conduct and the violation alleged." *Peatross*, 818 F.3d at 242. A causal connection is established when the supervisor's conduct, or lack thereof, "could be reasonably expected to give rise to just the sort

of injuries" that a plaintiff alleges have occurred. *Campbell v. City of Springboro*, 700 F.3d 779, 790 (6th Cir. 2012).

In the instant case, the Complaint sufficiently alleges that DeAngelo violated Venema's constitutional rights because: (1) the facts plausibly allege that DeAngelo knowingly acquiesced in the unconstitutional conduct of subordinates Keys and West through the execution of her job function; and (2) the facts plausibly allege that there is a causal connection between DeAngelo's acts and omissions and Venema's death.

    i.    *De*Angelo's knowing acquiescence in the unconstitutional conduct of her subordinates through the execution of her job functions

The Estate plausibly pleads that, at a minimum, DeAngelo knowingly acquiesced in the unconstitutional conduct of Keys and West. The cases of *Peatross v. City of Memphis*, 818 F.3d 233 (6th Cir. 2016), and *Coley v. Lucas County*, 799 F.3d 530 (6th Cir. 2015), are instructive on this point. In both cases, we held that supervising police officers could be liable for violations of a deceased's constitutional rights when complaints plausibly alleged that the supervisor-defendant had failed to train and supervise subordinate officers against engaging in the conduct that caused the death. In *Peatross*, two Memphis Police Department ("MPD") officers shot and killed Anjustine A. Hunter Vanterpool, allegedly violating Vanterpool's Fourth Amendment right to be free from unreasonable seizure. 818 F.3d at 236–238. Vanterpool's estate sought to hold the officers' supervisor, MPD Director Toney Armstrong, personally liable for Vanterpool's death. *Id.* at 238. We held that Vanterpool's estate plausibly alleged that Armstrong "at least knowingly acquiesced" in the unconstitutional conduct of his officers when he "failed to train and supervise the officers to avoid the use of excessive force, failed to investigate the allegations of excessive force properly, and attempted to cover-up the unconstitutional conduct of his subordinates by exonerating the officers." *Id.* at 243.

Likewise, in *Coley*, we held that the estate of a deceased pretrial detainee sufficiently pleaded supervisory liability on the part of a county sheriff for the deceased's death by chokehold. 799 F.3d at 534–35, 542. It was sufficient that the estate pleaded the sheriff's failure to train and supervise his subordinate officers, coupled with the sheriff's knowledge of his subordinates' constitutional violations. *Id.* at 542. Specifically, the *Coley* complaint alleged that

the sheriff "failed to train and supervise staff regarding the proper use of force," including "the use of a chokehold and the injuries derived therefrom," which caused the detainee's death. *Id.* And the "[p]laintiffs also allege[d] that [the sheriff] had 'full knowledge of the assault on [deceased] . . . but nonetheless intentionally and deliberately made false statements . . . about [his] knowledge.'" *Id.*

Taking the allegations in the Estate's Complaint as true, which we must at this stage, the Estate has plausibly alleged that DeAngelo at least knowingly acquiesced in Keys' and West's conduct under the precedent established by *Peatross* and *Coley*. As in those cases, the Complaint alleges that DeAngelo failed to train and supervise her subordinate officers to prevent constitutional violations, in this instance by failing to train officers to not provide plastic bags to at-risk prisoners, to not leave at-risk prisoners with plastic bags unattended, and to provide prompt medical intervention if a prisoner began to harm himself.

In *Peatross* and *Coley*, we arguably inferred the supervisors' knowledge of their subordinates' constitutionally violative conduct from the supervisors' alleged participation in covering up their subordinates' misconduct. Therefore, DeAngelo argues that those cases suggest that the Estate's complaint must contain like allegations that she "proactively tried to lie and cover up the misconduct" of her subordinates. Appellant's Br., ECF No. 28, 18–19, 24–32. But that is not so. *Coley* and *Peatross* do not hold that the only way to establish a supervisor's knowledge of, and therefore her knowing acquiescence in, unconstitutional conduct is through an identified pattern of constitutional violations that the supervisor has covered up. Instead, all *Peatross* and *Coley* suggest is that a plaintiff must plead a supervisor's knowledge of subordinates' constitutional violations in order to hold that supervisor liable for implicit authorization, approval, or knowing acquiescence in those violations. *See, e.g.*, *Coley*, 799 F.3d at 542 (crediting the estate's allegations that the sheriff had "full knowledge of the assault" on the deceased). In this case, the Estate has directly alleged, and DeAngelo has conceded for purposes of this appeal, her knowledge that "corrections officers at [WCC] were providing plastic bags to inmates at risk of suicide or self-harm" and "callously refraining from removing the plastic bags from the cells of inmates at risk of suicide or self-harm." SAC, R. 25, at 205–06. Because DeAngelo must accept the well-pleaded allegations that she knew that officers were flouting policy by leaving plastic

bags with at-risk prisoners, and that she failed to train and supervise the officers to not do so, the Complaint states a plausible claim that DeAngelo was liable as a supervisor for the officers' constitutional violations.

Moreover, the Estate alleges that, in addition to training and supervision, DeAngelo had sweeping control over WCC and was effectively solely responsible for WCC policy. Like policy-making allegations were not discussed in *Peatross* or *Coley*, and, in this case, provide additional support for our conclusion that DeAngelo at least knowingly acquiesced in Keys' and West's unconstitutional conduct.

We have said that a defendant-supervisor knowingly acquiesces in unconstitutional conduct when she "abandons the specific duties of [her] position in the face of actual knowledge of a breakdown in the proper workings of the department." *Winkler v. Madison Cnty.*, 893 F.3d 877, 898 (6th Cir. 2018) (cleaned up). In *Taylor v. Michigan Department of Corrections*, 69 F.3d 76 (6th Cir. 1995), we found liable "a defendant prison warden whose individual responsibility was to insure all prisoner transfers did not risk inmate safety" where the warden "fail[ed] . . . to establish a reasonable system to review prisoner files before transfer," resulting in "approved transfers which directly affected prisoner safety" and violated prisoners' Eighth Amendment rights. *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (citing *Taylor*, 69 F.3d at 80). We held that where there was evidence of this abdication of the warden's responsibility, along with evidence of the warden's "knowledge about the substantial risk of serious harm to [the] particular class of persons" in his care, the warden's supervisory liability was a triable issue of fact on summary judgment. *Taylor*, 69 F.3d at 81, 84.

In this case, the Estate alleges that DeAngelo, as warden of WCC, similarly abdicated her responsibility to ensure prisoner safety by failing to prevent the circulation of plastic bags to at-risk prisoners. DeAngelo was the warden of a facility that housed prisoners with acute mental-health issues, as evidenced by Venema's transfer to the facility while he was "decompensat[ing]." SAC, R. 25, Page ID #191. The Complaint alleges that it was DeAngelo's responsibility to oversee all aspects of WCC and ensure staff conformance with facility policy. This would include the provisions in Venema's MHMPs that instructed staff to remain in close proximity to suicidal prisoners, search prisoners for dangerous contraband, and intervene immediately in self-

injurious behavior. The Complaint also alleges that DeAngelo had "actual knowledge of a breakdown in the proper workings of" WCC, *Winkler*, 893 F.3d at 898, because she knew that corrections officers were providing plastic bags—dangerous contraband—to prisoners. And the Complaint plausibly alleges that DeAngelo was aware that the unsupervised circulation of plastic bags posed a substantial risk of serious harm to prisoners in her care, both because of the obviousness of such potential harm and because it was documented in Venema's MDOC records that he had previously attempted suicide with a bag. The Estate has sufficiently pleaded through these allegations that DeAngelo abandoned her responsibility to maintain and enforce facility policy against providing contraband to at-risk prisoners, establishing a constitutional violation.

For the foregoing reasons, the allegations in the Estate's complaint are sufficient to allege that DeAngelo "at a minimum, knowingly acquiesced in the unconstitutional conduct of [her] subordinates through the execution of [her] job functions." *Peatross*, 818 F.3d at 244 (internal quotation marks omitted).

ii. *The causal connection between DeAngelo's acts and omissions and Venema's death*

The Estate also sufficiently alleges a causal connection between DeAngelo's conduct and Venema's death. On causation, *Campbell v. City of Springboro*, 700 F. 3d 779 (6th Cir. 2012), is instructive. In *Campbell*, we concluded that although a police chief was not "actively involved" in dog-bite incidents, he was liable as a supervisor for the dog-bite injuries caused to plaintiffs, in part because there was a "causal connection between his acts and omissions" and the constitutional injuries alleged. *Id.* at 790. Among other acts and omissions, the defendant's failure to require appropriate supervision of the police department's canine unit and failure "to establish and publish an official K-9 unit policy . . . . could be reasonably expected to give rise to just the sort of injuries that occurred." *Id.*

As the plaintiffs in *Campbell* effectively alleged that the police chief abdicated his responsibility to "maintain[] a properly functioning K-9 unit" in a way that would protect against dog bites, *id.*, the Estate has alleged that DeAngelo abdicated her responsibility to ensure that plastic bags were kept out of unsupervised circulation. DeAngelo's alleged failure to ensure staff compliance with existing policies and her alleged failure to otherwise train or supervise officers

on the provision of plastic bags, "could be reasonably expected to give rise" to the unfortunate death that occurred in this case. *Id.* This is especially true considering the psychological vulnerability of Venema and the other prisoners in DeAngelo's care, DeAngelo's alleged knowledge of corrections officers' provision of plastic bags to at-risk prisoners, and her alleged knowledge that plastic bags were a potential tool for prisoners seeking to harm themselves. *See Peatross*, 818 F.3d at 244 (implying that the causal connection between a supervisor's acts and omissions and plaintiffs' constitutional injuries is strengthened when the supervisor has "actual knowledge" of the risks that would give rise to the injuries). Accordingly, the Estate sufficiently pleaded a causal connection between DeAngelo's acts and omissions and Venema's death. Because the Estate sufficiently pleaded this causal connection and DeAngelo knowingly acquiesced in Keys' and West's conduct, it has sufficiently pleaded that DeAngelo violated Venema's constitutional rights.

## 2. Violation of a Clearly Established Right

Having concluded that the Estate sufficiently pleaded that DeAngelo violated Venema's constitutional rights, we turn to the second prong of the qualified immunity analysis and examine whether Venema's allegedly violated constitutional rights were clearly established at the time of the violation. On a claim for supervisory liability, the Estate needs only to show that the right violated by the subordinate officers—in this case, Keys and West—was clearly established at the time of the violation. *Id.* at 245.

As discussed above, the Estate alleges that Keys and West violated Venema's Eighth Amendment rights through deliberate indifference to his serious medical needs, specifically his psychological conditions and his suicidality. And, as the district court noted, no party disputes that Venema was clearly known to be suicidal. In this Circuit, "ample case law" originating from before Venema's suicide in 2017 "teaches that deliberate indifference toward a detainee's suicidal tendencies is a violation of Constitutional rights." *Linden v. Washtenaw Cnty.*, 167 F. App'x 410, 425 (6th Cir. 2006); *see also Schultz v. Sillman*, 148 F. App'x 396, 404 (6th Cir. 2005) ("The jurisprudence of the Sixth Circuit has established a clear right of a prisoner not to have his psychological medical needs, in the form of suicidal tendencies, treated with deliberate indifference. . . . [C]learly established law [ ] would hold a corrections officer liable for deliberate

indifference to the risk of suicide if an inmate demonstrates a strong likelihood that he would commit suicide."). Therefore, to show a violation of Venema's clearly established rights, the Estate must show that Venema demonstrated "a strong likelihood of suicide," and that Keys and West were aware of, but chose to disregard, this likelihood. *Schultz*, 148 F. App'x at 404.

The district court concluded that Venema made this showing at the pleadings stage. However, we acknowledge that the determination of whether an official violated a clearly established right generally requires development of the factual record beyond the pleadings stage. *See Hart*, 973 F.3d at 635, 642–43; *Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 665–66 (6th Cir. 2021). But because Venema's Estate has stated a supervisory liability claim against DeAngelo, we affirm the district court's decision to deny judgment on the pleadings.

## IV. CONCLUSION

For the reasons set forth above, this Court **DENIES** the Estate's motion to dismiss DeAngelo's appeal for lack of jurisdiction and **AFFIRMS** the judgment of the district court denying DeAngelo's motion to dismiss on the basis of qualified immunity.

---

**DISSENT**

---

NALBANDIAN, Circuit Judge, dissenting. Tyler Venema's death was a tragedy. And after a tragedy, it is human nature to look for someone to blame. But Jodi DeAngelo is not that person. To be liable under 42 U.S.C. § 1983, a defendant must be individually involved in the deprivation of either a constitutional or statutory right. But the complaint fails to allege that here. So DeAngelo is entitled to qualified immunity. For this reason, I respectfully dissent.

**I.**

A complaint must include "sufficient factual matter, accepted as true to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reviewing plausibility, we "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). So "[c]onclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Bright v. Gallia County*, 753 F.3d 639, 652 (6th Cir. 2014) (quoting *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007)). And a complaint succeeds—or fails—based on its well-pleaded, nonconclusory factual allegations.

In a § 1983 claim, the plaintiff "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. There is no *respondeat superior* liability for supervisors under § 1983. *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021). Any liability a supervisor faces "must be based upon active unconstitutional behavior" by the supervisor himself. *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999). For that reason, the term supervisory liability is—strictly speaking—"a misnomer." *Iqbal*, 556 U.S. at 677. And it "has sharp limits." *Crawford*, 15 F.4th at 761. We don't assign constitutional tort liability based on job title.

A complaint claiming supervisory liability must allege specific facts to make plausible—not just possible—the claim that the supervising official "was *personally* at fault" and that his

actions "*caused* the injury." *Pineda v. Hamilton County*, 977 F.3d 484, 490 (6th Cir. 2020). Although the supervising official need not "physically put his hands on the injured party," mere allegations of a failure to train or supervise do not suffice.[1] *Peatross v. City of Memphis*, 818 F.3d 233, 241–42 (6th Cir. 2016). Our cases require both the supervisor's "active involvement" and a "causal connection" between that activity and the constitutional deprivation. *Crawford*, 15 F.4th at 761–62 (internal quotation marks omitted). Failure to satisfy either prong dooms a claim of supervisory liability. *Helphenstine v. Lewis County*, 60 F.4th 305, 321 (6th Cir. 2023).

## II.

The Venema Estate's claim fails on both prongs. Because the complaint offers nothing but conclusory allegations to show DeAngelo's knowledge, the estate can't show her active involvement in the constitutional deprivation. And since DeAngelo's alleged acts or omissions were not the proximate cause of Venema's death, the estate can't show a causal connection.

## A.

Begin with the active involvement requirement. Because an official's failure to adequately train or supervise his subordinates is not by itself a constitutional violation, the supervisor must have "encouraged the specific incident of misconduct or in some other way directly participated in it." *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 488 (6th Cir. 2020) (quoting *Hays v. Jefferson County,* 668 F.2d 869, 874 (6th Cir. 1982)). That means, "[a]t a minimum," the plaintiff must show how the "supervisory official at least implicitly authorized, approved[,] or knowingly acquiesced in the unconstitutional conduct." *Id.* at 487. A "mere failure to act" does not meet this burden. *Peatross*, 818 F.3d at 241. Nor can the claim rest on the allegation that a supervisor was "sloppy, reckless[,] or negligent in the performance of [his] duties." *Doe ex rel. Doe v. City of Roseville*, 296 F.3d 431, 439 (6th Cir. 2002). But when a supervisor consciously "abandon[s] the specific duties of his position" this can represent active involvement "in the face of actual knowledge" of the likelihood of a constitutional violation. *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992). So the complaint must plausibly allege

---

[1]A pure failure-to-train theory can support a *Monell* claim against a municipality. *J.H. v. Williamson County*, 951 F.3d 709, 720–21 (6th Cir. 2020). But the estate does not bring a *Monell* claim. Instead, it seeks to hold DeAngelo personally liable. So more is required.

that the supervisor "acted in a manner demonstrating deliberate indifference to the likelihood" of the constitutional deprivation. *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 868 (6th Cir. 2020).

At most, and charitably construed, the estate's complaint states that: DeAngelo knew that corrections officers were providing plastic bags to inmates at risk of suicide and that the officers were failing to remove them from the inmates' cells. The first allegation goes to DeAngelo's failure to train the officers about the risks of providing bags to suicidal inmates. The second alleges DeAngelo failed to supervise the officers to ensure they removed bags from the suicidal inmates' cells.

By themselves, these failure-to-train and failure-to-supervise allegations are not sufficient because they do not show that DeAngelo "knowingly acquiesced in the unconstitutional conduct"—the absolute "minimum" showing for supervisory liability. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays*, 668 F.2d at 874). And the allegation that DeAngelo knew about the unconstitutional conduct—that officers were providing plastic bags to the inmates at risk of suicide—is conclusory. *See Crawford*, 15 F.4th at 766. The complaint lacks facts supporting the inference that DeAngelo had any knowledge of the alleged practice.

Though not dispositive, it is telling that DeAngelo's name does not appear once in the "Factual Allegations" section of the complaint. Nor does the complaint allege any other facts describing past incidents or otherwise showing a pattern of conduct that would have placed DeAngelo on notice that plastic bags were left with inmates at risk of suicide. Without supporting facts, the conclusory allegation that DeAngelo had knowledge about correctional officers giving plastic bags to inmates at risk of suicide "receives no presumption of truth." *Caraway v. CoreCivic of Tenn., LLC*, 98 F.4th 679, 686 (6th Cir. 2024).

Given that "the conclusory nature" of these allegations "disentitles them to the presumption of truth," the next step is deciding whether the remaining, well-pled factual allegations support the claim against DeAngelo. *Iqbal*, 556 U.S. at 681. And I believe that they don't. Resisting that conclusion, the estate points to this court's decisions in *Peatross v. City of Memphis*, 818 F.3d at 233, and *Coley v. Lucas County*, 799 F.3d 530 (6th Cir. 2015). But the estate's reliance on these cases is misplaced. Despite their similar procedural posture and theory

of liability, the complaints in those cases bear little resemblance to the one before us now. And in each case, the court made clear that its denial of qualified immunity was based on facts that made the claim of supervisory liability plausible.

For instance, *Peatross* arose from the fatal shooting of Anjustine Vanterpool by two officers of the Memphis Police Department (MPD). 818 F.3d at 236–37. Claiming that the shooting had deprived Vanterpool of his Fourth Amendment right to be free from unreasonable seizures, Vanterpool's Estate sued both the arresting officers and Toney Armstrong, the MPD director. *Id.* at 238. In their complaint, the estate included specific facts showing that Armstrong knew about the increasing number of officer-involved shootings from 2009 to 2013. *Id.* The complaint alleged that, less than a year before Vanterpool's fatal shooting, "Mayor A.C. Wharton publicly admonished Director Armstrong and described the MPD as 'unacceptable' and in need of outside scrutiny." *Id.* And the complaint noted that Armstrong himself had "acknowledged a dire need to review and improve the police department's operations." *Id.* These specific facts were entitled to the presumption of truth, while "legal conclusions couched as factual allegations" would not be. *Id.* at 244 n.4. And the court held that the facts included in that complaint "plausibly allege[d] that Armstrong 'did more than play a passive role in the alleged violations or show mere tacit approval.'" *Id.* at 243 (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006)). So qualified immunity was not appropriate because Armstrong was actively involved in the constitutional deprivation.

Similarly, *Coley* involved the death of Carlton Benton, a pretrial detainee, after being placed in a chokehold. 799 F.3d at 534–36. The Benton Estate sued two officers who had taken part in the incident and their supervisor, Sheriff James Telb. The complaint alleged that Telb had a duty to both train and supervise the officers in his department and that his failure to do so resulted in Benton's death. But the complaint also said that despite Telb's "full knowledge of the assault on Carlton Benton," the sheriff had attempted to cover-up his subordinates' misconduct by "intentionally and deliberately ma[king] false statements to federal officials about [his] knowledge of . . . [the] chokehold and the deliberate failure to provide medical attention to Benton." *Id.* at 542 (second alteration in original). Based on these facts, the complaint plausibly alleged "that Telb 'at least implicitly authorized, approved or knowingly acquiesced in the

unconstitutional conduct of the offending subordinate' when he helped [his subordinates] to cover up their unconstitutional actions." *Id.* (quoting *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995)). So the court's holding that Telb was actively involved in the constitutional deprivation depended on the facts showing that he acted to cover-up his subordinates' wrongdoing. And these facts made the allegation that he knew of the unconstitutional conduct plausible.

The complaints in these cases provided more than conclusory allegations to describe how the supervisors were actively involved in a constitutional deprivation. It is here that I disagree with the majority, which reads *Peatross* and *Coley* to say that all "a plaintiff must plead" is "a supervisor's knowledge of subordinates' constitutional violations in order to hold that supervisor liable for implicit authorization, approval, or knowing acquiescence in those violations." Maj. Op. at 11. Both cases provided more than that.

And that reading ignores both the reasoning of these decisions and the complaints that support them. In both *Peatross* and *Coley*, the plaintiffs met their burden by including facts that moved the claim of the supervisor's knowledge from perhaps possible to plausible. *See Iqbal*, 556 U.S. at 678. And the complaints behind those cases had much greater depth of factual allegations on the supervisor's personal liability. Measured against the pleadings in those cases, the current complaint lacks facts about DeAngelo's involvement and tries to make up the difference with conclusory allegations. And, as we have noted, "a complaint distinguishable from our past cases on its face will not often survive a motion to dismiss on qualified immunity grounds." *Crawford*, 15 F.4th at 766.

Even on a motion to dismiss, merely saying something doesn't make it so. Here, the estate alleges that "DeAngelo knew the corrections officers at Woodland Correctional facility were providing plastic bags to inmates at risk of suicide or self-harm" and that they "were callously refraining from removing the plastic bags from the cells." R.25, Second Amended Compl., pp.20–21, PageID 205–06. But these conclusions about DeAngelo's knowledge are not supported by further factual allegations. There is no claim that DeAngelo was admonished by government officials for failing to address inmate suicides, nor is there any statement by her that acknowledged a need to improve the prison's suicide-prevention policies. She did not attempt to

cover up Venema's death, nor is there any similar fact indicating her knowledge of the problem. There is nothing besides the statement that she "knew" what was happening. And that is a legal conclusion, not a factual allegation. Such "[c]onclusory allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition," and that is exactly what qualified immunity is intended to guard against. *DM Rsch., Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999); *see also Marchek v. United Servs. Auto. Ass'n*, 118 F.4th 830, 833 (6th Cir. 2024) ("To survive a motion to dismiss, a complaint may not rely on conclusory legal allegations."). So this court should hold that DeAngelo is entitled to qualified immunity because the plaintiffs cannot show her active involvement in the alleged constitutional violations.

**B.**

Even if that weren't the case, the estate cannot show that DeAngelo's alleged actions caused the constitutional deprivation. And while we have noted that "causal weaknesses will more often be fodder for a summary-judgment motion," dismissal is still appropriate where the lack of causation is clear on the complaint's face. *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004). Even taking all non-conclusory allegations as true and making all reasonable inferences in the estate's favor, the complaint doesn't allege that DeAngelo caused the injury.

As in all tort cases, causation in this context has two elements—actual cause and proximate cause. Actual cause is generally understood as imposing a simple "'but for' test, which requires us to imagine whether the harm would have occurred if the defendant had behaved other than [she] did." *Garza*, 972 F.3d at 868 (alteration in original) (quoting *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007)). But proximate cause is more troublesome, such that "[a] firm definition for the term . . . has escaped judges, lawyers, and legal scholars for centuries." *Crosby v. Twitter, Inc.*, 921 F.3d 617, 623 (6th Cir. 2019) (alteration in original) (quoting *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 392 (6th Cir. 2018)). In application, we have equated this ineffable term with the overlapping concepts of substantiality, directness, and foreseeability. *Id.* at 624. So in supervisory-liability cases, we look to whether the "active unconstitutional conduct" of the supervisor "could be reasonably

expected to give rise to just the sort of injuries that occurred." *Crawford*, 15 F.4th at 762 (quoting *Peatross*, 818 F.3d at 244).

Even setting aside the question of actual causation, the estate can't meet its burden of showing that DeAngelo's actions or omissions were the proximate cause of Venema's death. A prerequisite to reasonable foreseeability is knowledge of a risk. So we generally limit supervisory liability "to times when the supervisor had existing knowledge of the specific type of conduct that led to a plaintiff's injuries." *Id.* at 767. As discussed, the allegations of DeAngelo's knowledge of the constitutional violations by her subordinates are conclusory and need not be accepted as true. And the estate "does not describe the experience of any past inmates at [WCC]" that would support the idea of a continuing practice or policy of giving plastic bags to inmates at risk of suicide. *Id.* This evidence is needed to show that DeAngelo knew or should have known about this risk—such that the danger was reasonably foreseeable. Without supporting facts, the estate can't show that DeAngelo's conduct proximately caused the alleged constitutional violation.

* * *

Because the estate does not state a plausible claim for relief against DeAngelo, I respectfully dissent.